IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

GRAND RIVER ENTERPRISES SIX
NATIONS LTD.,

                          Plaintiff,                          OPINION & ORDER

    v.
                                                             13-cv-104-wmc

VMR PRODUCTS LLC, d/b/a V2 CIGS,

                          Defendant.

---

In this action for trademark infringement, plaintiff Grand River Enterprises Six Nations, Ltd. ("Grand River") alleges that defendant VMR Products LLC's ("VMR") use of the VAPOR COUTURE mark in connection with electronic cigarettes infringes Grand River's federal trademark rights in its registered COUTURE mark.[1]  Both parties have moved for summary judgment.  (Dkt. ##49, 56.)  Also currently pending is VMR's motion to file an amended answer, affirmative defenses and counterclaim.  (Dkt. #54.)  For the reasons that follow, the court will grant leave to amend and deny both parties' motions for summary judgment.

PRELIMINARY MATTER

VMR's proffered amended pleading is essentially the same as its original in most respects, with two related exceptions.  *First*, VMR seeks to add as an affirmative defense its assertion that Grand River lacks enforceable trademark rights in the COUTURE mark due to alleged lack of use in United States commerce.  *Second*, VMR seeks to add a counterclaim

---

[1] The complaint initially alleged a violation of common law trademark rights as well.  The parties have since stipulated for the dismissal of that count of the complaint.  (Dkt. #140.)

for declaratory judgment that the COUTURE mark is invalid and unenforceable. (*See* Am. Answer (dkt. #55) Eleventh & Twelfth Affirmative Defenses, Counterclaim.)

While leave to amend pleadings should be freely given when justice so requires, Fed. R. Civ. P. 15(a)(2), circumstances may counsel against it. *Brunt v. Serv. Emps. Int'l Union*, 284 F.3d 715, 720 (7th Cir. 2002). For example, undue delay, bad faith or dilatory motive, prejudice to the other party, repeated failures to cure defects and futility justify a court denying leave to amend a pleading. *Foman v. Davis*, 371 U.S. 178, 182 (1962).[2]

VMR filed for leave to amend less than a month after filing its first answer, based on information it apparently discovered in the interim with respect to Grand River's filings in other courts. Moreover, VMR represents without contradiction that upon discovery of other litigation involving Grand River, it launched a diligent investigation and advised Grand River of its intent to move for leave to file the amended answer. There is, therefore, no evidence of bad faith, dilatory motive or undue delay on VMR's part. While Grand River also contends that it is prejudiced by the amendment, the short passage of time makes this unlikely. Indeed, Grand River has been able to brief the issues VMR raised in full in its response to the motion to amend (dkt. #67), and in its response to VMR's own motion for summary judgment (dkt. #97). Grand River also argues that the amendment is futile, but given that the issue will be resolved on summary judgment in any event, the court declines

---

[2] Grand River urges the court to apply the heightened standard of Rule 16(b)(4), which provides that a schedule "may be modified only for good cause and with the judge's consent," because VMR's request to amend came after this court's July 31, 2013, deadline for the filing of amendments. That deadline, however, was for amendments *without leave of court*. (See dkt. #19.) The pretrial conference scheduling order does not set an additional deadline for amending with the court's leave. As noted above, VMR sought leave to amend less than a month after its answer, making an assertion of undue delay, bad faith or prejudice hollow. Finally, even were VMR required to show "good cause," its prompt filing of a motion for leave upon discovery of the information in question would suffice under the circumstances here.

to cut off VMR's discussion of judicial estoppel at the pleading stage and will instead address VMR's arguments in ruling on the fully-briefed motion for summary judgment.[3]

## UNDISPUTED FACTS[4]

### I.   The Parties

Plaintiff Grand River is a cigarette manufacturer, doing business as a corporation under the laws of Canada, with its offices in Ontario, Canada.  Grand River has neither a parent company nor subsidiaries in the United States; similarly, it has neither a marketing or sales department, nor any offices in the United States.  Rather, Grand River sells its tobacco products, including cigarettes, to importers on an F.O.B. basis, who in turn sell and distribute Grand River's products in the United States.  Those importers are licensed to import tobacco products in the United States and include Tobaccoville, USA, Inc. ("Tobaccoville"), which is located in Hartsville, South Carolina; Native Wholesale Supply Company; Lake Erie Tobacco Company; Canadian Agricultural Depo; Empire Tobacco Company; and Rock River Manufacturing.  Grand River also sells electronic cigarettes, or "e-cigarettes," under the name "ESENECA."

Defendant VMR, a Florida limited liability company, was founded in 2009 and is located in Miami, Florida.  It sells various brands of e-cigarettes under the brand names V2 Cigs, Vapor Couture and Vantage Vapor.  E-cigarettes differ from traditional cigarettes in a number of ways.  First, they are battery-operated rather than combustible, potentially

---

[3] Because VMR's counterclaim of invalidity depends on statutory interpretation and the application of judicial estoppel, its arguments on those topics would not be presented to a jury even if the arguably contrary statements of fact Grand River has allegedly made might be relevant to other issues.

[4] The court finds the following facts, which are taken from the parties' proposed findings of fact, to be material and undisputed unless otherwise noted.

making them rechargeable and reusable.  Second, e-cigarettes weigh more than traditional cigarettes.  Third, they function by means of liquid cartridges that produce an inhalable vapor, rather than combustible smoke.  Fourth, e-cigarettes may be disassembled and put back together, while traditional cigarettes cannot.  Finally, unlike traditional cigarettes, e-cigarettes do not emit an odor.

## II. COUTURE Trademark

In 2008, Grand River selected the COUTURE mark for its cigarettes sold in the United States.   On December 22, 2008, it filed an intent-to-use trademark application for the COUTURE mark with the U.S. Patent and Trademark Office.  Since 2009, Grand River has sold cigarettes to an exclusive list of importers under this mark and now owns a federal trademark registration for COUTURE, No. 3,729,797, for use in connection with cigarettes. On August 9, 2012, Grand River also filed federal trademark application no. 85/699,543 for use of the COUTURE mark in connection with ashtrays, cigarette lighters, cigarette rolling papers, cigarette tubes, cigarettes and matches.  On or about June 21, 2013, Grand River filed for the mark "COUTURE" for e-cigarettes in Canada.

## III. VAPOR COUTURE Mark

In late 2010 or early 2011, VMR came up with the concept of selling a fashionable e-cigarette brand as a luxury item.  The goal was to create an e-cigarette that was different from other brands, including in appearance.  VMR's Chief Executive Officer, Jan Verleur, and the company's President, Dan Recio, considered a variety of names for their conceptualized brand.  After settling on fewer than ten possibilities, they searched to determine whether any of the corresponding internet domain names were available.  The

search revealed that only two prospects had available domain names: Vapor Lady and Vapor

Couture.  The latter was deemed the better choice for the product, and VMR purchased the

domain name.

On October 19, 2011, VMR filed intent-to-use trademark application no.

85/450,714 for the mark VAPOR COUTURE, for use in connection with "electronic

cigarettes … as an alternative to traditional cigarettes, not including smokeless tobacco, and

smokeless cigarette vaporizer."  (*See* Burkland Decl. Ex. E.)  Grand River subsequently filed

opposition no. 91205692 to the VAPOR COUTURE mark, so VMR's application has not

yet matured into a registration.  On February 14, 2012, the PTO sent a letter requiring that

VMR "disclaim the descriptive word 'VAPOR' apart from the mark as shown because it

merely describes a feature and characteristic of the goods."  (*See id.* at Ex. F, 2.)[5]  VMR

amended its application to add the requested disclaimer on March 2, 2012.  (*Id.* at 32-33.)

## IV. Products

### A. Couture

Couture cigarettes are slim-style cigarettes intended to appeal to fashion-conscious

women within the general target market of current adult smokers.  The trade name was

chosen to communicate the concept of fashionable, high-end or upscale products to its

customers.  The packaging also contains the word "slims," intended to communicate to

customers that the product is a "slim cigarette."  Couture cigarette packaging comes in jewel

and precious stone-inspired colors and themes, including ruby, amethyst, aquamarine,

---

[5] A "disclaimer" is a statement that the applicant does not claim exclusive rights to an unregistrable
component of a mark that is otherwise registrable.  15 U.S.C. § 1056(a).  Its purpose is to show that
an applicant is not making claim to the exclusive appropriation of the unregistrable component
"except in the precise relation and association in which it appear[s] in the drawing and description."
*In re Hercules Fasteners, Inc.*, 203 F.2d 753, 757 (C.C.P.A. 1953).

diamond, sapphire and turquoise.   While the packaging has jewel-toned accents, it is primarily white, with gold lettering, as in the examples below:



(*See* Burkland Decl. Ex. C (dkt. #59-3).)

Traditional tobacco cigarettes, like Couture, are subject to numerous limitations, including a prohibition on their sale over the Internet.   They are also subject to advertising restrictions, importation limitations, packaging and labeling restrictions, special taxes, and geographic use restrictions.   As such, Grand River views itself as a "highly regulated manufacturer" and considers itself to operate in "a generally hostile environment."

Since its first use of the COUTURE mark in 2009, Grand River has seen some sales of those products, with an initial spike leading to annual sales of approximately half a million dollars.   In subsequent years, revenues on COUTURE products have declined by

more than half.  (*See* Pl.'s Resp. DSPFOF (dkt. #106) ¶ 150; DSPFOF Ex. 23 (dkt. #84-23) ECF 6.)

### B. Vapor Couture

Vapor Couture's packaging is white and purple with gold lettering, and it was designed to be more visually appealing compared to VMR's V2 Cigs packaging.  The Vapor Couture website contains the following image of the product and its packaging:



(Burkland Decl. Ex. H (dkt. #59-8).)   The word "vapor" is present and visible on all advertising materials connected with Vapor Couture products.

Vapor Couture e-cigarettes may be used with a variety of cartridges.  Those cartridges come in numerous flavors, some of which are available without nicotine.  Vapor Couture is primarily an online brand, accounting for 15% of all of VMR's online sales.  30% of VMR's sales are offline; of those sales, Vapor Couture amounts to less than 5%.   In certain instances, VMR sells the accompanying USB charger and wall adapter in a Vapor Couture

starter kit, which contains the e-cigarette, accessories and packaging inserts.  The starter kit appears in certain advertisements, along with the USB charter and wall adapter.

Only 21 physical retail locations currently sell VMR's Vapor Couture e-cigarettes, including Smokie's Discount Shop in Milwaukee, Wisconsin; the Sunrise Smoke Shop in Ft. Lauderdale, Florida; the Tobacco Shop in Jackson, Mississippi; Scullin Oil in Sunbury, Pennsylvania; and Smoke-and-Go in Abbeville, Louisiana.  On April 23, 2013, however, VMR issued a press release announcing that it would enter into a strategic partnership with National Tobacco Company, aimed at "bring[ing] the V2 Cigs line of electronic cigarette products to a greatly expanded list of retailers across the nation."  VMR itself advertised that this partnership would bring VMR's products into nearly 30,000 brick-and-mortar retail locations by the end of 2013.  Although the press release dealt with V2 Cigs, VMR's corporate representative has testified that VMR is putting forth similar efforts to find brick-and-mortar retailers for Vapor Couture products.  Additionally, VMR attends trade shows for convenience and tobacco stores across the country in order to sell its products.

Vapor Couture e-cigarettes are advertised, at least in some advertising materials, as "designed exclusively for women."  (Burkland Decl. Ex. I (dkt. #59-9) ECF 4.)  VMR has further testified that although it is not legally required to restrict sales of e-cigarettes to adults, it has chosen to do so; its website states in capital letters that customers must be of legal smoking age to buy and/or use Vapor Couture products.  It website also states that its product is not marketed for use as a smoking cessation product and is "not intended for use by non-smokers."  (*Id.*)

The Frequently Asked Questions section of VMR's website explains what an electronic cigarette is by stating that a Vapor Couture e-cigarette "allows you to have a

8

realistic cigarette experience without the problems associated with tobacco cigarettes, such as smoke, tar, ash and odor." (*Id.* at ECF 155.)  It goes on to state that the vapor produced "satisfies just like smoke" and informs customers that they can use Vapor Couture e-cigarettes in "many places cigarettes are banned." (*Id.*)  It also provides a list of Vapor Couture flavors that match flavor profiles of traditional cigarettes, including "Vapor Couture Bombshell," which is compared to Turkish tobacco blends and many European cigarette varieties, and "Vapor Couture Rodeo Drive," which is compared to a "[c]lassic American tobacco blend." (*Id.* at ECF 156.)[6]  Finally, the website advises customers that "One Vapor Couture flavor cartridge lasts nearly as long as a pack of tobacco cigarettes." (*Id.* at ECF 157.)

## V. Grand River's Previous Representations in Litigation

### A. NAFTA Proceedings

In March of 2004, Grand River delivered a notice of arbitration under the UNCITRAL Arbitration Rules on its own behalf and on behalf of one of its importers, Native Wholesale Supply Company ("NWS").[7]  In July of 2011, the Arbitral Tribunal rendered a decision in the NAFTA Arbitration, determining that it lacked jurisdiction over Grand River's claims because Grand River lacked any investment or enterprise in the United States, either directly or through third parties.  It relied on various representations that Grand River's president, Steve Williams, had previously made, including: (1) Grand River itself does not sell any cigarettes or maintain any place of business within the United States;

---

[6] The list includes other flavors not directly compared to tobacco blends, including "Fresh Mint," "Passion Fruit," "Strawberry Champagne" and "Arctic Mint."

[7] The parties do not propose facts relating to the subject matter of this arbitration, though Grand River notes that the decision did not pertain to COUTURE cigarettes or to any trademark-related issues.

(2) Grand River is a Canadian company with its principal place of business in Canada and sells its cigarettes on an F.O.B. basis, with title and risk of loss transferring to third parties within Canada; (3) Grand River manufactures Tobaccoville's Seneca-brand cigarettes according to Tobaccoville's own blend specifications and ingredients; and (4) all of Grand River's sales to Tobaccoville take place in Canada, with Tobaccoville taking delivery of the cigarettes in Canada and then importing them into the United States.

### B. New York Litigation

In March of 2013, the State of New York filed a complaint against Grand River and NWS, alleging illegal sale and shipment of contraband cigarettes. Specifically, the case alleges that Grand River and NWS violated the Contraband Cigarette Trafficking Act ("CCTA"), 18 U.S.C. §§ 2341 *et seq.*; the Prevent All Cigarette Trafficking Act ("PACT Act"), 15 U.S.C. §§ 375 *et seq.*; and New York state tax laws. The CCTA is violated when a person sells "contraband cigarettes," defined as "a quantity in excess of 10,000 cigarettes, which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found." 18 U.S.C. § 2341(2). The PACT Act imposes filing requirements on any person who sells, transfers or ships for profit cigarettes "in interstate commerce," defined as "commerce between a State and any place outside the State, commerce between a State and any Indian country in the State, or commerce between points in the same State but through any place outside the State or through any Indian country." 15 U.S.C. § 375(9)(A). A sale made in interstate commerce under the PACT Act is "deemed to have been made into the State, place, or locality in which such cigarettes or smokeless tobacco are delivered." *Id.* at § 375(9)(B).

Grand River filed a brief in support of a Motion to Dismiss the Amended Complaint on October 23, 2013 and a reply brief on December 16, 2013.  Those briefs argue that Grand River cannot be liable under the CCTA and PACT Act, because Grand River only sells cigarettes within Canada.  Therefore, (1) the cigarettes it sells cannot be "contraband" under the CCTA, because they are not found within any state when Grand River sells them; and (2) Grand River cannot be held liable under the PACT Act, because it does not sell cigarettes in "interstate commerce" as the PACT Act defines that term.  (*See* Def.'s PFOF Ex. 3 (dkt. #50-3); *id.* at Ex. 4 (dkt. #50-4).)  In its reply brief, Grand River also argues that it is not in a "joint venture" with NWS, relying in part on the decision in the NAFTA Arbitration.[8]  (*See id.* at Ex. 4.)  No ruling has yet issued on that motion to dismiss.

**C. Other Lawsuits**

Finally, in multiple, additional lawsuits in the United States, Grand River has successfully avoided courts' exercise of personal jurisdiction by asserting that it is a Canadian tobacco company without contacts, sales, offices, distributor control or other business connections with the respective jurisdictions.  These lawsuits include:

- In *Wisconsin v. Grand River Enterprises, Inc.,* Case No. 02-CV-2314 (Wis. Cir. Ct. Dane Cnty. July 23, 2002), Grand River maintained it has no jurisdictional contacts with the State of Wisconsin and that any cigarettes produced or packaged by Grand River and sold in Wisconsin were sold by third-party distributors and/or importers.

---

[8] Under New York law, to establish a joint venture, a plaintiff must establish: (1) two or more parties entered an agreement to create an enterprise for profit; (2) the agreement evidences the parties' mutual intent to be joint venturers; (3) each party contributed property, financing, skill, knowledge, or effort to the venture; (4) each party had some degree of joint management control over the venture; and (5) there was a provision for the sharing of both losses and profits.  *Kidz Cloz, Inc. v. Officially For Kids, Inc.*, 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004).

Grand River also asserted that it is a Canadian company not subject to any U.S. federal regulation and does not import cigarettes within the jurisdiction of any state, including Wisconsin.  Rather, it sold the cigarettes on an F.O.B. basis in Ontario to importers, who in turn decided where to sell the products.  (Pl.'s Resp. DSPFOF (dkt. #106) ¶¶ 59-61, 63.)

- In *People v. Grand River Enterprises/6Nations, Ltd.,* Case No. 02-AS-07518 (Sup. Ct. Cal. Sacramento Cnty. Nov. 23, 2009), Grand River avoided personal jurisdiction in California by asserting it is merely a Canadian tobacco manufacturer with no contacts, sales, offices, distributor control or other business connections with California.  (Pl.'s Resp. DSPFOF (dkt. #106) ¶ 58.)

- In *South Dakota v. Grand River Enterprises*, 757 N.W.2d 305 (S.D. 2008), Grand River avoided personal jurisdiction in South Dakota by asserting it is merely a Canadian tobacco manufacturer with no contacts, sales, offices, distributor control or other business connections with South Dakota.  (Pl.'s Resp. DSPFOF (dkt. #106) ¶ 58.)


OPINION

I. **VMR's Motion for Summary Judgment**

A. **Standing**

VMR argues that Grand River lacks Article III standing to bring this lawsuit because it does not engage in commercial activity in the United States and thus cannot suffer any commercial or competitive injury.  To determine whether a person or entity has standing under the Lanham Act, the court must determine "whether they have 'a reasonable interest to protect' in a commercial activity."  *Stayart v. Yahoo! Inc.*, 623 F.3d 436, 439 (7th Cir.

2010) (quoting *Dovenmuehle v. Gildorn Mortg. Midwest Corp.*, 871 F.2d 697, 700 (7th Cir. 1989)).

It is undisputed that Grand River owns the United States federal trademark registration for COUTURE for use in connection with cigarettes.  (*See* Reply DPFOF (dkt. #107) ¶ 6.)   The court concludes this is sufficient to establish that Grand River has standing to sue in this case, since it has a commercial interest in protecting that mark and the accompanying goodwill.   Although VMR argues that Grand River has repeatedly represented that it does not engage in commercial activity in the U.S., meaning it cannot have suffered any "competitive injury" from VMR's U.S. activities, that argument depends on the application of judicial estoppel, which the court will address further below.   VMR offers no other challenge to Grand River's standing.   Accordingly, the court declines to dismiss this matter for lack of subject matter jurisdiction.

### B.  Shotgun Pleading

VMR next argues that Grand River's complaint is an improper "shotgun pleading," by which it means a pleading in which each count incorporates by reference all preceding paragraphs and counts of a complaint, even where many of the incorporated facts are immaterial to a particular count.  *See Starks v. City of Waukegan*, 946 F. Supp. 2d 780, 787-88 (N.D. Ill. 2013).  VMR quotes *CustomGuide v. CareerBuilder, LLC*, 813 F. Supp. 2d 990 (N.D. Ill. 2011), which describes such pleadings as "disfavored" because they "make it 'virtually impossible to know which allegations of fact are intended to support which claim(s) for relief.'"  *Id.* at 1001 (quoting *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996)).

The complaint in this case sets forth three separate causes of action, two of which remain:  (1) trademark infringement under the Lanham Act; and (2) false designation and unfair competition under the Lanham Act.  (*See* Compl. (dkt. #1) ¶¶ 29-36.)  The factual allegations leading up to those causes of action relate to:  (1) the parties; (2) Grand River's alleged rights in the COUTURE mark and products using that mark; and (3) VMR's attempted registration of the VAPOR COUTURE mark and its products using that mark. (*See id.* ¶¶ 1-28.)  Since those allegations are certainly relevant to, and support, each of the two causes of action, there is no "onerous burden" placed on defendant or the court in "sifting out irrelevancies."  If anything, the onerous burden comes from having to address defendant's ludicrous objection.  Thus, the court rejects defendant's demand that Grand River replead, particularly since defendant made that demand at summary judgment, when doing so would interrupt the parties' trial preparations and likely affect the trial date.

### C.  "Use in Commerce"

VMR devotes the bulk of its summary judgment submission to this argument, contending that Grand River has no trademark rights in its registered COUTURE mark because Grand River failed to actually use that mark in commerce.  In the United States, trademark rights do not arise from registration; they arise from actual use of a mark.  *Zazú Designs v. L'Oreal, S.A.*, 979 F.2d 499, 503 (7th Cir. 1992); *see also Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975, 979 (9th Cir. 2006) ("Registration does not create a mark or confer ownership; only use in the marketplace can establish a mark."); *San Juan Prods., Inc. v. San Juan Pools of Kansas, Inc.*, 849 F.2d 468, 474 (10th Cir. 1988) (noting that a trademark registration does not create the underlying right to exclude).

14

The Lanham Act defines use in commerce as follows:

> The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark.  For purposes of this chapter, a mark shall be deemed to be in use in commerce—
>
> (1) on goods when—
>
> (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
>
> (B) the goods are sold or transported in commerce.

15 U.S.C. § 1127.  "Commerce" is separately defined as "all commerce which may lawfully be regulated by Congress."  15 U.S.C. § 1127.  *Id.*

Applying these definitions, there can be no dispute that the COUTURE mark is used in commerce lawfully regulated by Congress.  *First,* the COUTURE mark appears on the packaging of Couture cigarettes.  *Second,* those cigarettes are sold to importers, who bring them into the United States and sell them to stamping agents and distributors, who in turn sell them to retailers and finally to consumers in this country.

Defendant's argument is, however, somewhat more nuanced.  While conceding that the COUTURE mark is, in fact, used in commerce, it argues that since *Grand River* has only used the mark in sales made in Canada, any indirect use *by others* in United States commerce is inadequate for Grand River to obtain trademark rights in this county.  Said another way, VMR contends that when Grand River sells the cigarettes to Canadian importers, its involvement in the commercial process is finished, and any later activities that take place represent the *importers'* use of the mark in commerce, whether or not Grand River contemplated such use.  In support of this argument, defendant cites *In re Silenus Wines,*

15

*Inc.*, 557 F.2d 806, 807 (C.C.P.A. 1977), in which the Court of Customs and Patent Appeals stated, "We note that the 'use in commerce' must be accomplished by the applicant."

The court finds defendant's interpretation of the Lanham Act strained at best.  As an initial matter, *Silenus Wines*, provides little, if any, support for defendant's position.  Indeed, the *Silenus Wines* court's expansive view of Congress's power over intrastate sales of products originating in a foreign country cuts decidedly the other way.  In *Silenus Wines*, the applicant in question ordered wines from a French concern, which, upon the applicant's instructions, affixed labels bearing the STEFMON mark.  *Silenus Wines,* 557 F.2d at 807.  The French concern then packaged the wine and shipped it to the applicant, which sold the wine solely within the state of Massachusetts.  *Id.*  The examiner declined to register the mark, finding that it had not been "used in commerce," and the Patent and Trademark Office Trademark Trial and Appeal Board affirmed.  *Id.*

The Court of Customs and Patent Appeals reversed, noting first that the Constitution expressly gives Congress the power to regulate commerce with foreign nations.  *Id.* at 809 (citing U.S. Const. art. I, § 8).  It then recognized that, "were it not for the intrastate sales anticipated by the appellant-importer, the foreign commerce that occurred in this case would probably not have occurred."  *Id.*  Thus, "appellant's sale within Massachusetts was so intimately involved with foreign commerce as to become a 'use in commerce' as defined in the Lanham Act."  *Id.*  The court also found further support for that conclusion within Supreme Court cases presenting a broad view of the commerce that Congress can lawfully regulate.  *Id.* (citing *Katzenbach v. McClung*, 379 U.S. 294 (1964)).  Based on Congress's broad regulatory power, it held "that intrastate sale of goods, by the

party who caused those goods to move in regulatable commerce [i.e., from foreign county to United States], directly affects that commerce and is itself regulatable." *Id.*

In short, the *Silenus Wines* decision suggests an expansive view of when a mark has been "used in commerce" such that the user has acquired trademark rights. *See* 4 McCarthy on Trademarks & Unfair Competition § 19:117 (4th ed. 2013) (disscussing *Silenus*). While *Silenus Wines* involved an applicant who admittedly sold the wines only within a single state, he nevertheless *affected foreign commerce* enough that those intrastate sales qualified as "commerce" under the Lanham Act. The present case involves a registrant who, while selling its cigarettes only to importers in Canada, certainly contemplated (if not expressly authorized) that those importers would sell COUTURE marked cigarettes to United States distributors and retailers, who in turn sell them to U.S. consumers. Like the *Silenus Wines* applicant's intrastate sales, the importer's sales would "probably not have occurred" absent Grand River's activities, suggesting that Grand River's Canadian sales are "so intimately involved with foreign commerce" that they constitute commerce under the Lanham Act. *Id.* at 809. Put another way, Grand River's sale of Couture cigarettes to importers caused the cigarettes to move in regulable commerce; under *Silenus Wines*, that means Grand River has used the COUTURE mark "in commerce" even though its own activities take place in Canada.

In any event, other case law supports a broader application of the Lanham Act's protections than defendant contends. For instance, *Laboratorios Roldan, C. por A. v. Tex Int'l, Inc.*, 902 F. Supp. 1555 (S.D. Fla. 1995), which Grand River cites, involved a foreign manufacturer who sold its products to independent exporters in the Dominican Republic, who in turn sold the products to other countries, including the United States. As here, the

defendants argued that the manufacturer could not establish trademark rights based on those sales because it did not itself export the products to the U.S. The district court rejected that argument:

> Who actually distributes the product to the end user is irrelevant; what is relevant is who was the actor that placed the product with the mark into commerce. . . . Since Plaintiff placed the mark on the product at the point of production, and was the first to distribute the product into the stream of commerce, and since the product with the mark was distributed into the United States marketplace, it is irrelevant that Plaintiff did not, itself, send the product into the United States.

*Id.* at 1566 n.12; *accord Mobilificio San Giacomo S.p.A. v. Stoffi*, No. 96-415-SLR, 1997 WL 699299, at *3 n.6 (D. Del. Sept. 23, 1997) (citing *Laboratorios*). While the *Laboratorios* decision is not binding, this court finds its reasoning persuasive.[9]

This does not end defendant's challenge to Grand River's assertion of trademark rights in the COUTURE mark, however, since in a closely-related but distinct argument, it

---

[9] The Fourth Circuit Court of Appeals has embraced a similarly broad interpretation of "use in commerce" under the Lanham Act, at least in the context of *foreign* commerce. *See International Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco*, 329 F.3d 359, 366 (4th Cir. 2003) ("the locality in which foreign commercial intercourse occurs is of no concern to Congress' power under the Constitution to regulate such commerce"; finding mere advertising of the "Casino de Monte Carlo" mark in New York, when coupled with evidence that U.S. citizens actually went to and gambled at the casino, constituted regulable "commerce" under the Lanham Act). It also rejected the notion that the activities in question must have a "substantial effect" on foreign commerce, stating:

> [T]he substantial effects test does not limit Congress' regulation of activity that is itself commercial intercourse occurring interstate; it governs only Congress' regulation of non-commercial intercourse activity that [a]ffects interstate commerce. Here, the regulated activity at issue is itself commercial intercourse (*i.e.*, the trademarks are an instrumentality of commercial intercourse . . .). And the regulated commercial intercourse involves transactions between United States citizens and the subject of a foreign nation, qualifying the intercourse as a literal example of foreign trade.

*Id.* at 369.

asks the court to apply the doctrine of judicial estoppel to bar Grand River from claiming use of that mark in the United States. The Seventh Circuit has recognized three factors that typically inform the application of judicial estoppel, though the doctrine is not easily reduced to a formulaic application: (1) a party's position must be clearly inconsistent with its previous position; (2) the party has succeeded in persuading a court to accept its earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled; and (3) the party seeking to assert the inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *In re Knight-Celotex, LLC*, 695 F.3d 714, 721-22 (7th Cir. 2012) (citing *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001)). Applying those factors, the court finds the doctrine of judicial estoppel inapplicable here.

Defendant contends that three separate proceedings support the application of judicial estoppel. *First*, it argues the finding by the NAFTA Tribunal that Grand River had no enterprise or investment in the U.S. estops Grand River from claiming one now. This argument fails for at least two reasons: (1) Grand River did not benefit from that position in the NAFTA proceedings but instead saw its claims dismissed for lack of jurisdiction (*see* dkt. #84-6); and (2) it is not at all clear that the lack of an "investment" or "enterprise" in the United States is inconsistent with the use of a mark in commerce. As Grand River points out, the Tribunal in that case simply determined that Grand River's cigarette plant in Canada did not constitute an "investment" as defined in Article 1139 of NAFTA. VMR's only response is that Grand River has itself relied on the NAFTA proceedings in the New York case, but that argument fails for another reason, as discussed further below. In any event, adopting the NAFTA determination that Grand River had no "investment" or

19

"enterprise" in the United States does not judicially estop a finding that it nevertheless used its COUTURE mark in commerce here, nor does it preclude Grand River from seeking to enforce its rights in that mark.

*Second*, defendant points to various cases in which Grand River successfully contended that courts in the United States lacked personal jurisdiction over it.  Again, this position is not necessarily inconsistent with Grand River's current position that it uses the COUTURE mark in United States commerce, having now consented to personal jurisdiction.  Personal jurisdiction requires a defendant to purposefully direct its activities toward the forum state in question.  *Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 112 (1987).  "[A] defendant's awareness that the stream of commerce may or will sweep [its] product into the forum state does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum state."  *Id.* Thus, the fact that Grand River has argued that it has not purposefully availed itself of the protections and benefits of Wisconsin, South Dakota or California, specifically, is not, on its face, inconsistent with its current position that its COUTURE mark has been used in "commerce" as defined by the Lanham Act.

Certainly, Grand River's statements in other litigation that it "is not subject to regulation in the U.S." are troubling, since those statements come perilously close to overlapping with the Lanham Act's definition of commerce.  But in the end, whether or not Grand River *itself* is subject to U.S. regulation absent consent, at least in the context of other litigation, does not directly equate with whether it used its *mark* in regulable commerce, especially given the broad scope of Congress's powers over such commerce and the expansive view courts have generally taken of what activities fall within the purview of

commerce under the Lanham Act.  Judicial estoppel, therefore, does not appear appropriate here, although now that Grand River has availed itself of the benefits and protections of a Wisconsin federal court, its future attempts to avoid personal jurisdiction in this and other courts may prove less successful.

*Third,* defendant relies on a currently-pending case in New York in which Grand River has moved to dismiss claims against it under the PACT Act and the CCTA.  Based on the record before this court, it is by no means clear that Grand River has persuaded the New York court to accept its position.  According to the parties, the motion to dismiss is still pending.  (*See* Def.'s Resp. PSPFOF (dkt. #102) ¶ 30.)   Once again, the standards applicable under the CCTA and the PACT Act are also not necessarily coterminous with the "use in commerce" standard of the Lanham Act.

Taking first the CCTA, a party is only liable when it sells "contraband cigarettes," meaning those which bear no evidence of payment of the tax in the state in which they were found.  Grand River has argued that because it sells the cigarettes while they are in Canada, *before* they have entered any U.S. state, it cannot be held liable under the CCTA.  This is not, however, inconsistent with its current position that it places COUTURE marked cigarettes into commerce, which ultimately enter the United States due to the actions of legally independent importers.

With respect to the PACT Act, that statute provides its own definition of "interstate commerce": "commerce between a State and any place outside the State, commerce between a State and any Indian country in the State, or commerce between points in the same State but through any place outside the State or through any Indian country."  15 U.S.C. § 375(9)(A).  This does not appear to be the same as the Lanham Act's standard, which

subsumes commerce with foreign countries in its definition, as well as commerce which substantially *affects* interstate commerce. *See Silenus Wines*, 557 F.2d at 809.[10]

For all these reasons, it does not appear appropriate to apply judicial estoppel here.[11]

### D. Willfulness

Finally, defendant asks the court to enter partial summary judgment on Grand River's contention that its infringement was willful. "A defendant acts willfully if he knows his actions constitute an infringement." *Philip Morris USA Inc. v. Lee*, 547 F. Supp. 2d 685, 693 (W.D. Tex. 2008) (citation and internal quotation marks omitted). Under the Lanham Act, "'willful blindness' is equivalent to actual knowledge." *Microsoft Corp. v. V3 Solutions, Inc.*, No. 01 C 4693, 2003 WL 22038593, at *15 (N.D. Ill. Aug. 28, 2003); *see also Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1149 (7th Cir. 1992) ("[W]e have held that willful blindness is equivalent to actual knowledge for purposes of the Lanham Act.").

Defendant contends a finding of willfulness is precluded here by Grand River's concession that VMR had no knowledge of Grand River or the COUTURE mark when it filed its application to register the VAPOR COUTURE mark. In response, plaintiff primarily argues that VMR was "negligent" in failing to conduct a search, which by its very term precludes a finding of willfulness. *See Hard Rock Café*, 955 F.2d at 1149 ("[W]e very much doubt that the district court defined willful blindness as it should have. To be willfully blind, a person must suspect wrongdoing and deliberately fail to investigate. . . . In

---

[10] For the same reasons, the court will also deny VMR's pending motion for Rule 11 sanctions.

[11] Because the court has concluded Grand River used the mark in commerce, it need not consider whether Grand River's importers and distributors are "related companies" pursuant to 15 U.S.C. § 1055, although that may also be the case.

short, it looks as if the district court found CSI to be negligent, not willfully blind."). In fairness, however, Grand River also points to evidence that VMR performed a trademark search on COUTURE after filing for the VAPOR COUTURE mark and discovered Grand River's mark at that time, as well as the fact that VMR had *actual* notice of the COUTURE mark no later than June of 2012, when Grand River filed its opposition to the VAPOR COUTURE application. (*See* dkt. #95-1.) Nevertheless, VMR proceeded to sell its Vapor Couture e-cigarettes. (*See* dkt. #22-1.)

Unfortunately for plaintiff, the fact that VMR learned of the COUTURE mark at some point is the *only* evidence of willfulness offered in response to defendant's motion for summary judgment. Nor has plaintiff pointed the court to a case in which mere knowledge of another mark, without anything more, constitutes willful infringement -- particularly where, as here, there remains to be resolved at trial a genuine, good faith dispute of fact as to whether VMR infringed at all. (*See* discussion, *infra.*)

Given the outrageous conduct that has been found sufficient to prove willfulness, plaintiff's inability to offer legal support is unsurprising. For example, a finding of willfulness was upheld where the infringer made sales using an infringing mark after attempting to register the mark and being turned down by the PTO because the mark was potentially confusing. *See Ty Inc. v. Softbelly's, Inc.*, 517 F.3d 494, 501 (7th Cir. 2008). Similarly, a defendant was found to have acted willfully when it engaged in negotiations to use the mark properly but then proceeded to use an infringing mark without authorization after those negotiations proved unsuccessful. *See Estate of Ellington ex rel. Ellington v. Harbrew Imports Ltd.*, 812 F. Supp. 2d 186, 195 (E.D.N.Y. 2011). Finally, a defendant was found to have acted willfully in continuing to operate his website (despite a prior ruling that it

infringed) *and* representing to the court that he had taken it down. *See Doctor's Assocs., Inc. v. Subway.SY LLC*, 733 F. Supp. 2d 1083, 1088 (D. Minn. 2010).

Summary judgment is the "'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (quoting *Schnacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). When VMR moved for summary judgment on the question of willful infringement, Grand River was placed on notice that it must come forward with enough evidence for a reasonable trier of fact to find in its favor. Evidence of mere knowledge of another's mark, at least where there are genuine issues as to whether the defendant's mark actually infringed, is not enough. Accordingly, VMR is entitled to summary judgment of no willful infringement.

## II. Grand River's Motion for Summary Judgment

Grand River also moves for summary judgment on its trademark infringement and unfair competition claims under 15 U.S.C. § 1114 and § 1125(a)(1)(A), respectively. To prevail on either claim, "a plaintiff must establish that (1) its mark is protectable and (2) the defendant's use of the mark is likely to cause confusion among consumers." *CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 673-74 (7th Cir. 2001). Grand River contends that no genuine dispute of fact exists on either account. Because the court disagrees as to the second factor, it will deny summary judgment to Grand River as well.

### A. Protectable Mark

As noted above, Grand River registered its COUTURE mark for use with respect to cigarettes. (*See* Compl. Ex. A (dkt. #1-1) (certificate of registration on principal register).)

That registration is prima facie evidence of the validity of the COUTURE mark and of Grand River's exclusive right to use the mark in commerce in connection with cigarettes. *See* 15 U.S.C. § 1057(b).  Grand River enjoys, therefore, a rebuttable presumption that it has a valid mark entitled to protection.  *See Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 301 (7th Cir. 1998).

Defendant responds with essentially the same arguments raised in the briefing on its own motion for summary judgment (*see* Def.'s Br. Opp'n (dkt. #85) 9-11), which the court has already addressed and rejected above.  Given that defendant offers no additional evidence to combat Grand River's presumptively-valid registration, the court agrees that no reasonable jury could find that Grand River lacked an enforceable mark under the Lanham Act.

## B.  Likelihood of Confusion

Not only is likelihood of confusion the "linchpin" of federal trademark infringement claims, it is also a fact-intensive inquiry.   *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 615 (7th Cir. 1993).  In the Seventh Circuit, courts evaluate seven factors in determining whether consumers are likely to be confused: "(1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; (6) actual confusion; and (7) intent of defendant to 'palm off his product as that of another.'" *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1043-44 (7th Cir. 2000) (quoting *Rust Env't & Infrastructure Inc. v. Teunissen*, 131 F.3d 1210, 1213 (7th Cir. 1997)).  No single factor is dispositive, and different factors will weigh more

heavily from case to case, depending on the facts and circumstances involved.  *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 898 (7th Cir. 2001).[12]

Because the ultimate conclusion on whether consumers are likely to be confused is a finding of fact, "a motion for summary judgment in trademark infringement cases must be approached with great caution."  *AHP Subsidiary*, 1 F.3d at 616.   Nevertheless, plaintiff argues that it is entitled to summary judgment because nearly all the factors listed above "weigh strongly" in its favor.

While the court ultimately disagrees, plaintiff has certainly presented some evidence weighing in favor of the likelihood of confusion here.  The strongest factor weighing in its favor is the second: cigarettes and e-cigarettes are undoubtedly similar products, all of the distinctions VMR identifies notwithstanding.  In assessing this factor, the court keeps in mind that the parties' products need not be identical, just "similar."  *See Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 463 (7th Cir. 2000).  The relevant question in assessing whether products are similar is "whether the products are the kind the public attributes to a single source."  *Jones Grp., Inc.*, 237 F.3d at 899 (quoting *McGraw-Edison Co. v. Walt Disney Productions*, 787 F.2d 1163, 1169 (7th Cir. 1986)).

---

[12] Plaintiff leaves unclear whether its claim is for:  (1) "forward confusion," in which customers think a junior user's goods or services come from the same source or are connected with the senior user's goods or services; or (2) "reverse confusion," in which a junior user saturates the market with a trademark similar or identical to that of a smaller senior user.  While either theory is actionable in the Seventh Circuit, the defendant's intent is not relevant in reverse confusion cases.  *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 957-61 (7th Cir. 1992).  That Grand River calls this "[a] classic case of reverse confusion" in its reply certainly suggests it intends to proceed under that theory, as does its concession that there is no evidence VMR was aware of either Grand River or the COUTURE mark when it registered VAPOR COUTURE.  (*See* Pl.'s Resp. DSPFOF (dkt. #102) ¶¶ 54-55.)  Even assuming the seventh factor of intent is relevant, this fact does not weigh in on the current record.

Under this flexible standard, cigarettes and e-cigarettes certainly qualify as similar products that could be attributed to a single source. Indeed, it is undisputed that Grand River actually *does* sell both cigarettes and e-cigarettes, the latter under the ESENECA mark. Furthermore, both products generally deliver nicotine in cigarette form (although VMR has presented evidence that some of its e-cigarette flavors do not contain nicotine). Some e-cigarette flavors are even intended to taste the same as actual tobacco cigarettes, including VMR's own "Vapor Couture Bombshell" and "Vapor Couture Rodeo Drive." The differences VMR identifies -- for example, that e-cigarettes weigh more, function via battery power and are rechargeable, rather than combustible -- appear to be mainly technical distinctions that have little bearing in light of these overarching similarities. In any event, defendant has presented no evidence showing the public would not attribute cigarettes and e-cigarettes to a single source, and so Grand River is correct that this factor undoubtedly weighs in its favor.

The remaining evidence Grand River offers, however, does not clearly favor its position. First, with respect to the similarity of the marks themselves, the common use of the word "couture" in both COUTURE and VAPOR COUTURE favors plaintiff, as does the descriptive nature of the word "vapor" in this context. Customers may well interpret "Vapor Couture" as an indication that Vapor Couture e-cigarettes have been "licensed, approved or otherwise authorized" by the Couture brand. *See Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1088 (7th Cir. 1988). But this is not the end of the relevant inquiry to similarity for a reasonable trier of fact. Analysis of this factor must account for how consumers will actually encounter the marks in question. *See Barbecue Marx, Inc.*, 235 F.3d at 1044 ("Because the public will encounter the marks in written as

27

well as spoken form, we believe it is essential to consider the marks' visual characteristics."). The court cannot simply assume, at least in the absence of definitive evidence, that consumers will *only* encounter the marks aurally or in textual form, rather than as they are depicted on the packaging.  Indeed, on a cold record, the opposite appears more likely.

Therefore, the inquiry may not be as simple as comparing the words COUTURE and VAPOR COUTURE.  Here, the packages use distinctly different fonts and focal points, with "Couture" being the focus of COUTURE packaging and a stylized "VC" the focus on VAPOR COUTURE packaging.  Color varies between COUTURE packages, and the jewel-toned pinks and blues of some of its packages bear little resemblance to the purple and gold of VAPOR COUTURE packaging (although the font's colors are similar).  Given these nuances, the court cannot say this factor weighs "overwhelmingly" in either party's favor.[13]

The third factor (area and manner of concurrent use) presents a similarly equivocal analysis.  "Generally, where the trade channels differ and do not lead to the same target purchasers, there is less likelihood of confusion, and more where the channels and customers are the same or converge."  Richard L. Kirkpatrick, *Likelihood of Confusion in Trademark Law* § 5:12.1, at 5-38 (May 2012) (footnotes omitted).  Factors to analyze the area and manner of concurrent use include: (1) the relative geographical distribution areas; (2) evidence of direct competition; (3) whether the products are sold to consumers in the

---

[13] Grand River also argues that the court should disregard the word "vapor" in the VAPOR COUTURE mark, since VMR has disclaimed that portion as descriptive.  In the Seventh Circuit, "if one word or feature of a composite trademark is the salient portion of the mark, it may be given greater weight than the surrounding elements."  *Int'l Kennel Club*, 846 F.2d at 1087-88 (quoting *Henri's Food Prods. Co., Inc. v. Kraft, Inc.*, 717 F.3d 352, 356 (7th Cir. 1983)).  "A disclaimed segment of a composite registration is usually not the 'dominant' part."  4 McCarthy on Trademarks & Unfair Competition § 23:45 (4th ed. 2013).  This suggests Grand River is correct to a point: "Couture" is likely the dominant portion of VMR's mark.  For reasons discussed above, however, this does not mean the court should disregard the VAPOR portion of the mark entirely and analyze the marks as identical to one another.

same type of store; (4) whether the products are sold in a similar section of a particular store; and (5) whether the product is sold through the same marketing channels.  *See Jones Grp., Inc.*, 237 F.3d at 900.

Here, Grand River has produced limited evidence that this factor necessarily weighs in its favor, much less definitively so.  Vapor Couture is primarily an online brand, sold in just 21 retail stores and amounting to less than 5% of VMR's offline sales, which in turn make up only 30% of VMR's total sales.  (Pl.'s Resp. DSPFOF (dkt. #106) ¶¶ 130-32.)  In contrast, Couture cigarettes are sold to importers, who in turn sell and distribute those products throughout the United States.  The parties further agree that Couture cigarettes cannot be sold over the Internet and that Grand River does not even maintain a website.  Moreover, plaintiff has presented no evidence suggesting that smokers of traditional cigarettes, who are unable to purchase those cigarettes online, would encounter the primarily-online Vapor Couture e-cigarettes, nor has it presented evidence of direct competition between the brands even at the 21 brick and mortar stores in which Vapor Couture is sold.  Although plaintiff relies heavily on VMR's apparent plans to expand the V2 Cigs and Vapor Couture brands and its attendance at trade shows, it also presents no evidence that Vapor Couture is sold at the trade shows in question or that VMR's "efforts" to get Vapor Couture into additional retail locations have borne fruit.

The fourth factor, degree of consumer care, is likewise equivocal here.  Generally, "[t]he more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases." *CAE, Inc.*, 267 F.3d at 683.  Less sophisticated consumers may also increase the likelihood of confusion, while more sophisticated consumers will decrease it.  *Rust Env't*. 131 F.3d at

1217.  Plaintiff points to various cases in which courts have concluded this factor weighs in favor of likelihood of confusion in the cigarette context.  *See, e.g., Lorillard Tobacco Co. v. Van Dyke Liquor Mkt., Inc.*, 471 F. Supp. 2d 822, 830 (E.D. Mich. 2007); *Philip Morris, Inc. v. Star Tobacco Corp.*, 879 F. Supp. 379, 388 (S.D.N.Y. 1995).  VMR responds that other considerations in this case might *decrease* the likelihood of confusion, such as the discerning tastes of fashion-conscious women (and, apparently by implication, the increased care with which they would select a cigarette, or at least a luxury e-cigarette).  *Cf. Nina Ricci, S.A.R.L. v. Gemcraft Ltd.*, 612 F. Supp. 1520, 1529-30 (S.D.N.Y. 1985) ("Women who use expensive perfumes are discriminating and sophisticated consumers.  They know their perfume."); *see also* Kirkpatrick, *supra*, at § 6:5, at 6-12 (increased degree of care may result from "estimation of the mark as a fashion or status symbol"); *id.* at 6-13 (increased degree of care may result from purchaser "seek[ing] to satisfy personal tastes").  While defendant may not persuade a reasonable jury that these nuances a separate market make, given the dearth of any expert evidence on this factor and the difficulty of assessing it with any confidence at this stage, the degree of care consumers will exercise in this context is best left to trial.

There is likewise little evidence from which the court can conclude that COUTURE is a strong mark.[14]  "The crucial question [on this factor] is whether the mark is strong enough that the public will form an association between the mark and the source of that

---

[14] The court notes that plaintiff appears to focus on the wrong question for purposes of reverse confusion (assuming for the moment that reverse confusion *is* Grand River's theory).  In a reverse confusion case, "the inquiry focuses on the strength of the junior mark because the issue is whether the junior mark is so strong as to overtake the senior mark."  *Walter v. Mattel, Inc.*, 210 F.3d 1108, 1111 n.2 (9th Cir. 2000); *see also Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 959 (7th Cir. 1992) ("In a reverse confusion case, then, it may make more sense to consider the strength of the mark in terms of its association with the junior user's goods.").  However, neither party has discussed: (1) the strength of the VAPOR COUTURE mark, or (2) the strength of the COUTURE mark in connection with Vapor Couture e-cigarettes.

particular good." *Sullivan v. CBS Corp.*, 385 F.3d 772, 777 (7th Cir. 2004). The sales information presented by Grand River in its responses to VMR's interrogatories suggests that the COUTURE mark has not yet established a strong foothold in the United States cigarette market; Grand River even concedes in its responses to VMR's proposed findings of fact that "it takes longer to get a brand established for tobacco products due to restrictions." (Pl.'s Resp. DSPPOF (dkt. #106) ¶ 150.)[15]   Furthermore, Grand River provides no marketing surveys or expert testimony suggesting that the COUTURE mark is strong. Additionally, although VMR does not appear to take issue with Grand River's argument that COUTURE is either arbitrary or suggestive (and a mark's classification may play into its strength, *see Munters Corp. v. Matsui Am., Inc.*, 909 F.2d 250 (7th Cir. 1990)), even an arbitrary mark's presumptive strength may not translate outside of its narrow area of use (in this case, traditional cigarettes). *See Sullivan*, 385 F.3d at 777 ("Survivor" mark was strong against other aspiring rock bands or musical groups but provided weak or nonexistent protections outside that niche). Without more evidence than plaintiff has provided to date, the court cannot conclude that this factor necessarily weighs in its favor.

Finally, and perhaps most importantly, plaintiff has presented no evidence of actual confusion. Evidence of actual confusion is one of the most important factors in a trademark analysis, *Jones Grp., Inc.*, 237 F.3d at 898, though it is not essential to a finding of likelihood of confusion, *Eli Lilly & Co.*, 233 F.3d at 465. Plaintiff may be able to prevail notwithstanding its failure to come forward with any evidence on this point, but the lack of

---

[15] Grand River argues that its mark is *relatively* strong, given the short duration of its use in the United States, but arguing "relative strength" is itself something of a concession given that the real question is whether consumers have formed an association between the COUTURE mark and Grand River's Couture cigarettes.

*any* evidence tending to show actual confusion is problematic, given that that COUTURE has been on the market since 2009 and Vapor Couture has been on the market for, at a minimum, more than a year.[16]   Furthermore, plaintiff has apparently undertaken no consumer survey, nor has it presented the testimony of a marketing expert on this issue. While it is true that not all cases allow for a showing of actual instances of confusion, *CAE, Inc.*, 267 F.3d at 686, for this factor to weigh in plaintiff's favor, it must present at least *some* evidence on this point, *Barbecue Marx*, 235 F.3d at 1045-46.  It has not done so.

In view of the conflicting evidence presented on summary judgment, this case is not "so one-sided that there can be no doubt about how the question [of likelihood of confusion] should be answered."  *Packman v. Chi. Tribune Co.*, 267 F.3d 628, 637 (7th Cir. 2001) (quoting *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 171 (7th Cir. 1996)). While plaintiff may well prevail on its claims at trial, a reasonable jury could also find that it has not met its burden to show likelihood of confusion by a preponderance of the evidence.  See *Ty Inc. v. Softbelly's Inc.*, 353 F.3d 528, 535 (7th Cir. 2003) (noting that plaintiff Ty had burden of proof on likelihood of confusion).  Accordingly, Grand River is not entitled to judgment as a matter of law.

ORDER

IT IS ORDERED that:

1) Defendant VMR Products LLC, d/b/a V2 Cigs's Motion for Summary Judgment (dkt. #49) is GRANTED IN PART with respect to plaintiff's claim of willfulness and DENIED IN PART consistent with the opinion above;

---

[16] The parties dispute when Vapor Couture went on the market.  VMR contends that it was introduced in April of 2011, and Grand River argues that VMR did not sell any Vapor Couture products until July of 2012.  Even the latter date, however, would appear to provide enough time for *some* actual confusion to arise.

2)  Defendant's Motion to File an Amended Answer (dkt. #54) is GRANTED;

3)  Plaintiff Grand River Enterprises Six Nations Ltd.'s Motion for Summary Judgment (dkt. #56) is GRANTED IN PART with respect to its claim of a protected mark and DENIED IN PART as described above;

4)  The parties' stipulation to dismiss count three (dkt. #140) is GRANTED;

5)  Defendant's Motion for Rule 11 Sanctions (dkt. #174) is DENIED; and

6)  The Final Pre-Trial Conference is this matter is rescheduled to Thursday, June 5, 2014, at 2:00 p.m.

Entered this 29th day of May, 2014.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge